UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CRISTHIAN JARED SOLIS-MARTINEZ,

                    Petitioner-Plaintiff,

- vs. -

REBECCA ADDUCCI, in her official capacity as
Detroit District Director of U.S. Immigration &
Customs Enforcement; MATTHEW T. ALBENCE,
in his official capacity as Deputy Director and
Senior Official Performing the Duties of the Director
of the U.S. Immigration & Customs Enforcement;
CHAD WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland Security;
WILLIAM P. BARR, in his official capacity as
Attorney General, U.S. Department of Justice; and
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,

                    Respondent-Defendants.

Case No. ___1:20-cv-01175___

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241
AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1. Petitioner-Plaintiff ("Plaintiff") is an immigration detainee being held at the Geauga County Jail ("Geauga"). Plaintiff may have a medical condition that makes him particularly vulnerable to grave illness or death if infected by COVID-19, and he faces an acute risk of contracting the virus unless he is released immediately.

2. The novel coronavirus that causes COVID-19 has led to a global pandemic. As of the time this Petition was being finalized, on May 27, 2020, over 5,684,795 people worldwide have received confirmed diagnoses of COVID-19, and over 352,225 of those people have died.[1] There is no vaccine against COVID-19, and there is no known cure. It is highly contagious, and it is particularly virulent because even asymptomatic people can transmit it to others. No one is immune from contracting the illness. COVID-19 is most likely to cause serious illness and elevated risk of death for older adults and those with certain underlying medical conditions or disease.

3. COVID-19 can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including the heart and liver. Patients with serious cases of COVID-19 require advanced medical support, including positive pressure ventilation and extracorporeal mechanical oxygenation in intensive care. That treatment can require the use of specialized equipment, like ventilators. The pandemic has put ventilators in high demand and short supply around the world, and has led to severe shortages of personal protective equipment ("PPE") such as face masks and gowns. Patients who do not die from serious

---

[1] Worldometer (May 27, 2020). *COVID-19 CORONAVIRUS PANDEMIC.* Retrieved from https://www.worldometers.info/coronavirus/#countries.

cases of COVID-19 may face permanent damage to their health and/or prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.

4. The only known effective ways to reduce the risk of serious illness or death caused by COVID-19 for vulnerable people are social distancing and improved hygiene. As a result, unprecedented public health measures to eliminate concentrations of people are being undertaken in all fifty states and around the world.

5. People in enclosed group environments—where they live, eat, and sleep in close proximity—face increased danger of contracting COVID-19, as already evidenced by the trenchant spread of the virus on cruise ships and in nursing homes. This problem is particularly acute with respect to people who are confined in jails and other correctional facilities, for whom it is impossible to engage in the necessary social distancing as well as the hygiene required to mitigate the risk of transmission. More people in confinement are testing positive for COVID-19 with each passing day, and there are increasing numbers of confirmed positive cases among prisoners and guards in Ohio's prisons and jails, with seven state prisons already under quarantine. Regrettably, prisons and jails are effective incubators for the disease: for example, at the Rikers Island jail in New York City, the number of confirmed cases jumped from one to over 200 in roughly twelve days.

6. Belmont Correctional Institution in Eastern Ohio now has a confirmed positive inmate caseload of 90 and 84 prison employees for a total of 134 cases since the first one reported on April 13, 2020. As of May 16, 2020, 58 inmates and 2 prison employees had died of COVID-19, with another 4,400 prisoners and 566 corrections officers and staff testing positive for COVID-19. Testing is only conducted on individuals exhibiting

symptoms of the disease, disregarding the presence and incubation of the disease in asymptomatic individuals.

7.  For this reason, leading public health experts are recommending the prompt release from custody of people, such as Plaintiff, who are at risk for serious consequences of COVID-19. This both protects those with vulnerability and also ameliorates risk for all people detained and working in jails, as well as in their surrounding communities. Release of vulnerable people such as Plaintiff also reduces the burden on the region's limited healthcare infrastructure, as it lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time and exhaust the available resources.

8.  If Plaintiff continues to be detained at Geauga during the current outbreak of COVID-19, he faces a danger that is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" and that violates their constitutional right to safety in government custody. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

9.  Plaintiff asks this Court to issue a Writ of Habeas Corpus and order his immediate release, subject to appropriate precautionary public health measures, such as home quarantine and confinement upon release, on the ground that his continued detention violates the Due Process Clause of the U.S. Constitution. In the alternative, Plaintiff asks this Court to issue injunctive relief ordering Defendants to release him immediately, with appropriate precautionary public health measures, on the grounds that his continued detention violates the Due Process Clause.

**PARTIES**

10. Plaintiff Cristhian Jared Solis-Martinez (detained at Geauga) is a citizen of Honduras who has been detained by ICE since February 20, 2020. Mr. Solis-Martinez is married and expecting his first child with his United States Citizen wife.  Mr. Solis-Martinez suffers from chronic headaches, leg pain, and neck pain for which he took medication pre-detention. As a consequence, he is at high risk for severe illness or death if he contracts COVID-19.

11. Respondent-Defendant Rebecca Adducci is the Detroit District Director of ICE. In that position, she is responsible for carrying out ICE's immigration detention operations at Geauga and Seneca. Defendant Adducci is a legal custodian of Plaintiff, and the proper respondent for a habeas petition. *See Roman v. Ashcroft*, 340 F.3d 314, 321 (6th Cir. 2003). She is sued in her official capacity.

12. Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. In that position, he is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiff. He is sued in his official capacity.

13. Defendant Chad Wolf is Acting Secretary of the U.S. Department of Homeland Security. In that position, he is responsible for the enforcement of the immigration laws and supervises Ms. Adducci at ICE Detroit Field Operations. Defendant Wolf is a legal custodian of Plaintiff. He is sued in his official capacity.

14. Defendant William P. Barr is Attorney General of the United States and chief officer of the U.S. Department of Justice. He is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, routinely does and transacts business in

the Northern District of Ohio, and is a legal custodian of Plaintiff. He is sued in his official capacity.

15. Defendant ICE is a federal law enforcement agency within the U.S. Department of Homeland Security. ICE is responsible for criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations, a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiff.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction) and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

17. Venue lies in the U.S. District Court for the Northern District of Ohio, the judicial district in which Plaintiff is currently in custody. Venue is proper in the Northern District of Ohio under 28 U.S.C. § 1391, as venue is proper in any district in which in which a substantial part of the events or omissions giving rise to the claim occurs.

18. Petitioner has exhausted all available administrative remedies and his only remedy is by way of this judicial action, though exhaustion is not required if there would be irreparable harm. *See, e.g., Richardson v. Reno*, F. Supp., 1998 WL 74229, *3 (S.D. Fla. February 13, 1998). Exhaustion is also not necessary where an agency's interpretation of a statute is clearly at odds with the statute's plain meaning. *Id.* No petition for a writ of habeas corpus, has previously been filed in any court to review the detention and restraint complained of herein. Petitioner is in the custody of United States Immigration and Customs Enforcement.

## FACTS

### A. COVID-19 Poses a Grave Risk of Harm, Including Grave Illness or Death

6

19. COVID-19 reached pandemic status at least two months ago. As of May 27, 2020, at least 1,725,275 people in the United States have tested positive for COVID-19, and 100,572 people in the United States have died from the disease.[2] These numbers jump many digits each day and it is unknown how many cases in fact exist in the United States as only 15,532,159 of the current population of 330,817,010 have actually been tested for the disease.[3]

20. In many people, COVID-19 causes fever, cough, and shortness of breath. Some people suffer much more serious disease or death. Certain underlying medical conditions, as well as age, increase the risk of serious complications, disease, or death from COVID-19.

21. Moreover, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, or even a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle, which can also affect the heart's electrical system, reducing the heart's ability to pump. Reduced pumping can lead to rapid or abnormal heart rhythms in the short term, and to long-term heart failure that limits exercise tolerance and the ability to work. In addition, COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine- release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.

---

[2] Worldometer (May 27, 2020). *COVID-19 CORONAVIRUS PANDEMIC.* Retrieved from https://www.worldometers.info/coronavirus/#countries.
[3] *Id.*

22. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection as soon as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

23. But the virus's symptoms may take up to fourteen days to manifest. Several studies have shown that people infected with COVID-19 are most contagious one to three days before they begin to show symptoms. By some estimates, as many as twenty-five percent of people infected may not show symptoms at all. However, they are nevertheless highly infectious to others.

24. Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and, in extreme cases, extracorporeal mechanical oxygenation. Plaintiff, if infected with the disease, is likely to need advanced support, which requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians. In a pandemic, the numbers of patients requiring this level of support can quickly exceed local healthcare resources.

25. The need for care, including intensive care, and the likelihood of death, are much higher from COVID-19 infection than from influenza. Sources differ, but all reports are grave: sources report fatality rates ranging from nearly 2% to over 15% for populations at high risk for complications from COVID-19, such as those, like Plaintiffs, with comorbidities. Moreover, recent studies estimate that the COVID-19 fatality rate for the general population ranges from six to thirteen times as high as a severe seasonal influenza fatality rate, even in advanced countries with highly effective healthcare systems.

26. The specific mechanism of mortality of critically ill COVID-19 patients is uncertain but may be related to virus-induced acute lung injury, inflammatory response, multiple organ damage and secondary nosocomial infections. Those who survive serious cases of COVID-19 may require long-term rehabilitation because of damage to lung tissue and possibly other organs, including the heart, kidney, and neurologic systems.

27. There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection from COVID-19. On March 26, 2020, Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases (NIAID), estimated that a vaccine could be developed in eighteen months. Vaccines typically take between eight and ten years to develop. Vaccines usually must be tested in four phases before they attain regulatory approval: (1) animal testing, (2) small-group human testing to assess safety and monitor immune response, (3) medium-sized group testing to assess members of at-risk groups, and (4) large-scale testing on thousands of people. Moreover, more time is needed after approval to distribute the vaccine across the country. With these long trials and distribution schedules in mind, other experts have expressed the view that the 18-month estimate given by Dr. Fauci is optimistic.

28. According to the CDC, the disease is mainly transmitted between people via respiratory droplets produced when an infected person coughs or sneezes. Experts also believe that infected people may leave the virus on surfaces or objects, allowing it to spread when another person touches that object and then touches their own mouth, nose or possibly their eyes. The main strategy to limiting the disease's spread is social distancing, or remaining physically separated at least six feet from other individuals, and hygiene, including thoroughly washing hands with soap and water. Because individuals may be

contagious while asymptomatic, these measures must be taken before individuals display
symptoms.

29. Projections by the Centers for Disease Control and Prevention ("CDC") indicate that over
200 million people in the United States could be infected with COVID-19 over the course
of the pandemic without effective public health intervention, with as many as 1.7 million
deaths in the United States alone.

## B. Plaintiff Faces an Elevated Risk of COVID-19 Infection

30. As of May 27, 2020, there were 31,191 confirmed cases of COVID-19 and 1,842
confirmed deaths, with an additional 2,248 individuals in the CDC Expanded Definition
(Probable) case category and 202 deaths in the same "probable" category.[4] By these
estimations, the total number of COVID-19 cases in Ohio as of May 27, 2020 is 33,439
with 2,044 deaths.[5]

31. The COVID-19 outbreak in Ohio has resulted in unprecedented health measures to
facilitate and enforce social distancing. On April 2, Governor Mike DeWine extended
Ohio's Stay-At-Home Order through May 1, which went into effect on April 6.[6] The new
order included new regulations that restrict the number of customers allowed inside

---

[4] Ohio Department of Health (May 27, 2020). *Coronavirus (COVID-19) Dashboard*. Retrieved from
https://coronavirus.ohio.gov/wps/portal/gov/covid-19/home.
[5] *Id.*

[6] NBC4 Staff, *Read the Full Order: Ohio Stay-at-Home Order Extended Until May 1*, NBC 4
(Apr. 2, 2020), https://www.nbc4i.com/community/health/coronavirus/gov-dewine-extends-
ohios-stay-at-home-order-until-may-1/.

essential businesses and asks anyone traveling into Ohio to self-quarantine for two weeks with few exceptions.[7]

32. As of April 9, 2020, at least 11 people imprisoned in Cuyahoga County Jail and one staff person have tested positive for coronavirus.[8] One staff person has tested positive at the Butler County Jail, one of Ohio's four jail-ICE detention centers. It is inevitable that COVID-19 will reach Seneca and Geauga if it is not already present. Two weeks later on April, 24, 2020, Cuyahoga County Jail had 56 inmates test positive for coronavirus, as well as 8 corrections officers.[9] Undoubtedly, these numbers have skyrocketed since with little to no adequate personal protection equipment and proper cleaning supplies in the jails.

33. Indeed, over the past weeks, hundreds of COVID-19 diagnoses have been confirmed at local, state, and federal correctional facilities across the United States and in Ohio. Governor DeWine has authorized the Ohio National Guard to provide medical assistance at Elkton federal prison in Lisbon, Ohio due to the number and rate of coronavirus infections at that federal facility. There, at least thirty-seven people have been hospitalized due to COVID-19, seventy-one have been quarantined with symptoms, and

---

[7] *Id.*

[8] Scott Noll and Kaylyn Hlavaty, *11 Cuyahoga County Jail Inmates, 1 Corrections Officer tests positive for coronavirus*, WEWS (Apr. 9, 2020), https://www.news5cleveland.com/news/continuing-coverage/coronavirus/11-cuyahoga-county-jail-inmates-1-corrections-officer-tests-positive-for-coronavirus

[9] Adam Ferrise, *56 Cuyahoga County Jail inmates tested positive for coronavirus, 36 percent of jail inmates affected by virus,* cleveland.com (Apr. 24, 2020), https://www.cleveland.com/metro/2020/04/56-cuyahoga-county-jail-inmates-tested-positive-for-coronavirus-36-percent-of-jail-inmates-affected-byvirus.html.

three have died.[10] Reporting indicates that a few days prior, only seventeen people had been in isolation and twenty hospitalized.[11]

34. According to the Marshall Project, a nonprofit producing journalism about criminal justice, there were at least 29,251 people in prison that had tested positive for the disease, which is a nineteen (percent (19%) increase from the week before.[12] Ohio prisons have a total of 4,550 COVID-19 cases with 63 deaths thus far.[13]

35. The conditions at the Geauga detention facility, which is an enclosed group environment where people live, sleep, and eat in close proximity, poses a heightened risk for the spread of COVID-19. Other enclosed group environments, such as cruise ships and nursing homes, have seen extremely high COVID-19 transmission rates. The danger is even greater at Geauga, where people are rarely more than six feet apart at any time, scant medical resources are available, and many detainees are at high risk of serious infection.

36. At Geauga, Plaintiff and other detainees sleep in pods of up to 60 people. These dormitories have no windows that can open, and therefore provide no ventilation.[14] females, most sleeping areas house two people and contain just enough space for two

---

[10]Vince Grzegorek, *At Elkton Prison in Ohio, 37 Inmates Hospitalized Due to COVID-19, 3 Dead, 71 in Isolation*, Cleveland Scene (Apr. 7, 2020), https://www.clevescene.com/scene-and-heard/archives/2020/04/07/at-elkton-federal-prison-in-ohio-37-inmates-hospitalized-due-to-covid-19-3-dead-71-in-isolation.

[11] *Id.*
[12] The Marshall Project, *A State-by-State Look at Coronavirus in Prisons,* (May 22, 2020), Retrieved from https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons
[13] *Id.*

[14] Noah Lanard, *A Haitian Asylum-Seeker Did Everything Right. ICE Sent Him to a Windowless Jail Cell*, Mother Jones (Dec. 7, 2018), https://www.motherjones.com/politics/2018/12/a- haitian-asylum-seeker-did-everything-right-ice-sent-him-to-a-windowless-jail-cell/

beds, one toilet, one sink, one small desk, and two lockers. Beds are only two or three feet apart from each other. Detainees sleep close together and spend most of their days in the same room, and are rarely, if ever, more than six feet from other people. There have been no changes to cleaning or sanitation procedures since the COVID-19 pandemic began. According to Plaintiff, the detainees are forced to clean without the necessary cleaning chemicals. *See Plaintiff's Declaration,* **Exhibit "1"** ¶7. Detainees continue to eat their meals communally, multiple times per day. Staff does not sanitize the chairs or tables before meals. Detainees do not have free access to soap and there are no paper towels available.

37. Given these conditions, there are no circumstances under which Defendants can continue to detain Plaintiff and also ensure his safety. Geauga simply cannot adhere to the CDC's social distancing guidelines. It is impossible for Plaintiff to shelter in place, free from the risk of interacting with strangers who may be carriers for the disease, or to maintain distance or hygiene among himself. *See Dr. Vinogradsky's Declaration,* **Exhibit "2"** ¶2.

38. Given the risk of infection posed by COVID-19, and the fact that detainees cannot isolate themselves from infected residents or staff, it is only a matter of time until the virus infects the Plaintiff. Geauga Jail confirmed the first case of COVID-19 on March 16, 2020 and the disease has begun to spread.[15] The early evidence bears this out: for example, the rate of infection in New York City jails is more than seven times as high as the rate of infection in New York City overall. Indeed, ICE has not grappled with the fact

---

[15] Kaylyn Hlavaty, *First positive case of COVID-19 confirmed in Geauga County,* (March 16, 2020), Retrieved from https://www.news5cleveland.com/news/continuing-coverage/coronavirus/first-positive-case-of-covid-19-confirmed-in-geauga-county

that COVID-19 may spread asymptomatically, having instituted no protocol for testing of detainees or staff who enter the detention facility exhibiting no symptoms.

39. The staff at jails like Geauga also have a higher likelihood of transmitting coronavirus due to the lack of protective gear and the impossibility of social distancing. Accordingly, detainees in Ohio and other Ohio facility staff are at very high risk for contracting the virus.

40. Other jails around the country have tried mitigation efforts to no avail. The virus continues to infiltrate and spread through correctional facilities. The top doctor at New York City's Rikers Island jail has lamented how extensive mitigation efforts failed to slow the spread of the disease at the jail. He joins a chorus of public health experts in concluding that for such efforts to be effective, they must be paired with a reduction in the number of people incarcerated.

41. When correctional facilities have been unwilling to release vulnerable people to address the heightened danger of COVID-19 infection, courts have not hesitated to intervene to protect the civil liberties, health, and lives, of those most vulnerable to infection. For example, in the past week, a federal court in Michigan granted temporary restraining orders to release two ICE detainees at high risk for severe illness if they were to contract COVID-19. *Malam v. Adducci*, No. 5:20-cv-10829, ECF. 22, 29 (E.D.Mich., Apr. 5 2020, Apr. 9, 2020). New York judges recently ordered the release of ICE detainees who were at high risk of serious illness were they to contract COVID-19 because of an outbreak in their respective jails. *Basank v. Decker*, No. 20-cv- 2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Coronel v. Decker*, __ F. Supp. 3d __, No. 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020). Similarly, on March 31, the District Court for

the Middle District of Pennsylvania granted a Temporary Restraining Order releasing a group of individuals at high risk for serious illness were they to contract COVID-19 from ICE detention. *Thakker v. Doll*, __ F. Supp. 3d __, No. 1:20-cv-480 (M.D. Pa. Mar. 31, 2020). Likewise, two federal district courts in California have, in multiple cases, ordered the release of immigrants due to the pressing health concerns created by ICE detention. *See, e.g., Benv. Barr*, No. 19-cv-06123-DMR (N.D. Cal. Apr. 9, 2020); *Bahena Ortuno v. Jennings*, No. 20-cv-02064- MMC (N.D. Cal. Apr. 8, 2020); *Castillo v. Barr*, __F.3d__, 20-cv-0065, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Hernandez v. Wolf*, CV 20-60017-TJH (C.D. Cal. Apr. 1, 2020).

## C. People Vulnerable to COVID-19 Should Be Released from ICE Detention

42. Leading public health experts have recommended that Plaintiff, and other detainees, be released from Geauga and similar correctional facilities.

43. Dr. Joseph J. Amon, an infectious disease epidemiologist who has decades of experience as a public health researcher and practitioner, has declared that "while hand washing and disinfecting surfaces is advisable, the main strategy for limiting disease transmission is social distancing and that for such distancing to be effective it must occur before individuals display symptoms." He has cautioned that the risks for COVID-19 are especially great for "older people and those with cardiovascular disease, diabetes, chronic respiratory disease, and cancer." This fact, combined with ICE's inability to sufficiently protect its detainees, has led Dr. Amon to conclude that "the population [of detention facilities] must be reduced," with the priority being "[t]he release of individuals who can be considered at high-risk of severe disease if infected with COVID-19."

44. Plaintiff, detained at Geauga, is a citizen of Honduras who has been detained by ICE since February 20, 2020. Plaintiff entered the United States in December 2016 and has not departed the country since then. Plaintiff has three forms of relief pending: U-Visa application, asylum application, and i-130 marriage visa application.

45. Plaintiff avers he suffers from chronic leg pain, and has had a persistent cough for which he has been unable to obtain treatment. Plaintiff also suffers from migraines, dizziness, anxiety and depression. He has been unable to take medication for these ailments while in detention.

46. If released, Plaintiff will stay with his wife at their home in Cleveland, Ohio where he would be able maintain safe distances from others and self-quarantine if necessary.

## LEGAL BACKGROUND

### A. Plaintiffs Have a Constitutional Right to Reasonable Safety in Custody

47. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). As a civil detainee, Plaintiff's detention is governed by the Fifth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).[16] Under the Fifth

---

[16] Plaintiffs' continued detention also violates the Eighth Amendment's prohibition of cruel and unusual punishment—a much stricter standard than the Fifth Amendment's ban on any punishment, which applies here. This is because Defendants have ignored "a condition of confinement that is sure or very likely to cause serious illness" by crowding Plaintiffs into living quarters with others who have "infectious maladies . . . even though the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 32-33. See *Bell*, 441 U.S. at 539; *Thakker*, 2020 WL 1671563, at *8 n.15 (ordering immediate release of immigration detainees due to COVID-19 under the Fifth Amendment and, *citing Helling*, finding that plaintiffs had also met the "more exacting Eighth Amendment standard").

Amendment, civil detention may not "amount to punishment of the detainee." *Bell*, 441 U.S. at 535.

48. Because of Plaintiff's underlying health conditions, which may make him especially vulnerable to grave illness or death if he contracts COVID-19, the conditions of his confinement are not "reasonably related to a legitimate governmental objective"; instead they are "arbitrary or purposeless[.]" *See Bell*, 441 U.S. at 539. *See also J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709 (6th Cir. 2020) (applying *Bell* test to pre-trial detainee's conditions of confinement claim); *Turner v. Stumbo*, 701 F.2d 567, 572 (6th Cir. 1983) (same).

49. Plaintiff's detention is not "reasonably related" to its objective because it creates a serious risk of imminent illness and death. *See Bell*, 441 U.S. at 539. This risk is urgent, imminent, and unrelated to any legitimate governmental goal, as several federal courts have already held. *See, e.g., Malam*, 2020 WL 1672662, at *12; *Xochihua-Jaimes v. Barr*, No. 18-71460, ——F. App'x. ——, 2020 WL 1429877 at *1 (9th Cir. Mar. 24, 2020) (*sua sponte* ordering immediate release of immigrant petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers"); *Thakker*, 2020 WL 1671563, at *8 (ordering immediate release of immigrant petitioners because "we can see no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments.").

50. When the government fails to meet its obligation to provide adequate medical care, courts have a responsibility to remedy the resulting constitutional violation. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) ("When necessary to ensure compliance with a constitutional

mandate, courts may enter orders placing limits on a prison's population."). The power to remedy constitutional violations arising from government confinement falls within the Court's broad power to fashion equitable relief. *See Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978).

51. To vindicate detainees' due process rights in the face of the COVID-19 pandemic, federal and state courts across the country have ordered the release of detained individuals. *See, e.g., Malam*, 2020 WL 1672662 (ordering release of detainee in Michigan due to threat of COVID- 19); ); *Bahena Ortuno v. Jennings*, No. 20-cv-020640-MMC (N.D. Cal. Apr. 8, 2020) (same); *Hernandez v. Wolf*, No. 20-60017-TJH (C.D. Cal. Apr. 1, 2020) (same); *Thakker v. Doll*, No. 1:20- cv-480, ⸺F. Supp. 3d⸺, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) (same for 13 detainees in Pennsylvania); *Coronel v. Decker*, No. 20-cv-2472, ⸺F. Supp. 3d⸺, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (ordering release of four medically vulnerable immigrant plaintiffs held in New York and New Jersey detention centers due to threat of COVID-19); *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503, at *1 (S.D.N.Y. Mar. 26, 2020) (same, for ten immigrant plaintiffs who "suffer[] from chronic medical conditions, and face[] an imminent risk of death or serious injury in immigration detention if exposed to COVID-19"); *Calderon Jimenez v. Wolf*, No. 18-10225-MLW, Dkt. 507 (D. Mass. Mar. 26, 2020) (ordering grant of bail for an immigrant detainee held in Plymouth County, Massachusetts because "being in jail enhances risk"). On March 23, 2020, the Ninth Circuit ordered, *sua sponte*, the release of an immigrant petitioner "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers." *Xochihua-Jaimes*, No. 18-71460, ⸺

18

F. App'x——, 2020 WL 1429877, at *1 (9th Cir. Mar. 23, 2020).

## B. ICE Has the Authority to Release Detained People in Its Custody

52. It is well within ICE's authority to comply with constitutional requirements by releasing people who are vulnerable to severe illness or death if they contract COVID-19. For example, the regulations governing ICE's release authority state that serious medical conditions are a reason to parole an individual, as "continued detention would not be appropriate" in such cases. 8 C.F.R. § 212.5(b)(1).

53. ICE not only has the authority to exercise its discretion to release individuals from custody, but has routinely done so for detainees like Plaintiff.

54. This exercise of discretion comes from a long line of agency directives explicitly instructing officers to exercise favorable discretion in cases involving severe medical concerns and other humanitarian equities militating against detention.

55. ICE's discretion applies regardless of the statutory basis for a noncitizen's detention.

## C. This Court Has the Authority to Order Plaintiffs' Release

56. This Court's authority to order Plaintiffs' release to ensure their constitutional rights are protected is well established. District courts have "ample authority" to address "each element" contributing to a constitutional violation. *Hutto v. Finney*, 437 U.S. 678, 687 (1978).

57. Courts regularly have exercised this authority to remedy constitutional violations caused by overcrowding. *See Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding

that court did not exceed its authority in directing release of low-bond pre-trial detainees as necessary to reach a population cap), *cert. denied*, 465 U.S. 1108 (1984).

58. Where the government fails to meet its obligations to provide for adequate medical care, courts have a responsibility to remedy the resulting constitutional violation. *See Brown v. Plata*, 563 U.S. 493, 511 (2011). As a result, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Id.*

59. These constitutional principles make clear, consistent with the opinions of leading public health experts, that releasing Plaintiff is the only viable remedy to ensure his safety from the threat to his health that COVID-19 poses.

60. In the face of this great threat, social distancing and hygiene measures are Plaintiff's only defense against COVID-19. Those protective measures are impossible at Geauga, where Plaintiff shares close sleeping quarters, toilets, sinks and showers, eat and recreate in communal spaces, and are unavoidably in close contact with the many other detainees and officers around them. Because these conditions pose a heightened risk of infectious spread, Plaintiffs face unreasonable harm from continued detention.

## CLAIMS FOR RELIEF

### Violation of Fifth Amendment Right to Substantive Due Process
### (Unlawful Punishment)

61. Plaintiff repeats and realleges each and every allegation above, as if set forth fully herein.

62. The Fifth Amendment of the Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it subjects civil detainees to cruel

treatment and conditions of confinement that amount to punishment or does not ensure those detainees' safety and health.

63. Defendants are subjecting Plaintiff to heightened risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure. Because of Plaintiff's particular vulnerabilities, he may risk serious illness and death if infected with COVID-19. Defendants are subjecting Plaintiff to a substantial risk of serious harm, in violation of Plaintiff's rights under the Due Process Clause.

64. Leading public health experts agree that Plaintiff "[is] at grave risk of severe illness and death" if he remains in jail at Geauga. Accordingly, Defendant's detention of Plaintiff amounts to punishment and fails to ensure his safety and health.

65. There is no reasonable relationship between any legitimate government objective and keeping Petitioner detained in his current condition.

66. For these reasons, Defendants' ongoing detention of Plaintiffs violates the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a. Issue a Writ of Habeas Corpus and order Plaintiff's immediate release, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clause;

b. In the alternative, issue injunctive relief ordering Defendants to immediately release Plaintiff, with appropriate precautionary public health measures, on the ground that his continued detention violates the Due Process Clause;

c. Issue a declaration that Defendants' continued detention in civil immigration custody of individuals at risk for severe illness violates the Due Process Clause;

d. Award Plaintiff his costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

e. Grant any other and further relief that this Court may deem fit and proper.

Respectfully Submitted,

Svetlana J. Schreiber (0027604)
Svetlana Schreiber & Assoc. Co. L.P.A.
2510 Saint Clair Avenue
Cleveland, Ohio 44114-4013
Office: 216-621-7292
Fax: 216-621-7293

## VERIFICATION

Pursuant to 28 U.S.C. section 2242, the undersigned certifies under penalty of perjury that she has reviewed the foregoing petition and that the facts stated therein concerning Petitioner are true and correct.

Svetlana J. Schreiber

## CERTIFICATE OF SERVICE

I, hereby, certify that on this 28th day of May, 2020, I caused the Respondents, Rebecca Adducci et al., to be served a copy of the Petition for Writ of Habeas Corpus and Motion for Emergency Injunctive Relief with Temporary Restraining Order via personal service and Respondents Rebecca Adducci, Matthew Albence, William P. Barr, U.S. ICE, and Chad Wolf to

22

be served a copy of the Motion for Injunctive Relief with Temporary Restraining Order via
certified U.S. mail to:

Rebecca Adducci
Detroit District Director
U.S. Immigration and Customs Enforcement
333 Mt. Elliott Street
Detroit, Michigan 48207


Matthew T. Albence
Deputy Director and Senior Official Performing the Duties of Director
U.S. Immigration and Customs Enforcement
500 12th Street, SouthWest
Washington, D.C. 20536


William P. Barr
U.S. Attorney General
Department of Justice
950 Pennsylvania Avenue, NorthWest
Washington, D.C. 20530


Chad Wolf
Acting Secretary of Department of Homeland Security
MS 0485
U.S. Department of Homeland Security
Washington, D.C. 20530


U.S. Immigration and Customs Enforcement
333 Mt. Elliott Street
Detroit, Michigan 48207

Svetlana Schreiber
Attorney for Petitioner

## EXHIBIT LIST

**Description**                                                                    **page #**


**1.** Plaintiff's Declaration…………………………………………………… 25-26

**2.** Dr. Vinogradsky's Declaration………………………………………………27-29