## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

Cristhian Jared Solis-Martinez,               Case No. 1:20cv1175

                                  Petitioner,

          -vs-                                JUDGE PAMELA A. BARKER


                                              MEMORANDUM OPINION & ORDER

  Rebecca Adducci, et al.,

                           Respondents

        This matter is before the Court upon the Petition of Cristhian Jared Solis-Martinez for Writ

of Habeas Corpus under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief.

(Doc. No. 1.)  Respondents Rebecca Adducci, Matthew Albence, Chad Wolf, William Barr and the

United States Immigration and Customs Enforcement Agency ("ICE") filed an Answer/Return of

Writ on June 24, 2020, to which Petitioner Solis-Martinez responded on July 3, 2020. (Doc. Nos. 4,

8.)  For the following reasons, Solis-Martinez's Petition is DISMISSED and his request for injunctive

relief is DENIED.

I.      Background

        Petitioner Cristhian Jared Solis-Martinez ("Petitioner" or "Solis-Martinez") is an immigration

detainee in the custody of the United States Immigration and Customs Enforcement Agency ("ICE")

pursuant to 8 U.S.C. § 1236(a), pending Immigration Court proceedings.  (Declaration of George J.

Roberts, III (Doc. No. 4-1) at ¶ 3.)  He is currently being held at the Geauga County Jail in Chardon,

Ohio.  (*Id*.)

Solis-Martinez is a native and citizen of Honduras.  (*Id.* at ¶ 4.)  He was born in April 1999 and is currently 21 years old.  (*Id.*)  On December 23, 2016 (when he was 17 years old), Solis-Martinez was apprehended by the United States Border Patrol in the Rio Grande Valley, Texas, after entering this country without being admitted or paroled after inspection by an immigration officer. (*Id.*)  Because he was an unaccompanied minor, Solis-Martinez was issued a Notice to Appear ("NTA")[1] Form I-862 and turned over to the Office of Refugee Resettlement for care and custody. (*Id.*)

In January 2017, Solis-Martinez was released into the custody of his mother, who was residing in Cleveland, Ohio.  (*Id.* at ¶ 5.)  According to George J. Roberts III (who is a Deportation Officer with the Cleveland Sub-Office of Enforcement and Removal Operations ("ERO"), ICE), Solis-Martinez "repeatedly failed to comply with Voice ID programs with ICE" while he was in his mother's custody.  (*Id.* at ¶ 6.)  As a result, on April 16, 2019, Solis-Martinez was placed on an electronic monitoring ("GPS") tether as part of ICE's Alternatives to Detention Program.  (*Id.*)

On February 19, 2020, Solis-Martinez was taken into ICE custody for failing to comply with his electronic monitoring requirements.  (*Id.* at ¶ 11.)  Specifically, Mr. Roberts avers that Solis-Martinez failed to charge his GPS bracelet for six days, despite the fact that he had been "previously advised multiple times by ERO officers to keep his bracelet charged."  (*Id.*)  Based on a recently conducted psychological assessment, Solis-Martinez asserts that his alleged non-compliance with ICE's program requirements is due to the fact that he has significant cognitive deficits and "the IQ of a 7-year old."  (Doc. No. 8 at p. 1; Doc. No. 8-1.)

---

[1] The NTA charged Solis-Martinez as inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(A)(1), based on his entry into the United States without inspection.  (Doc. No. 4-1 at ¶ 4.)

2

When Solis-Martinez was taken into ICE custody on February 19, 2020, an initial medical intake assessment was performed by medical staff at the Geauga County Jail.  (Doc. No. 4-1 at ¶ 15.) According to Mr. Roberts, at that time, Solis-Martinez advised medical staff that he did not take any medications or have any heart or respiratory problems.  (*Id.*)  Mr. Roberts further avers that a chest x-ray of Solis-Martinez revealed that his lungs were clear.  (*Id.*)

On May 1, 2020, Solis-Martinez appeared with counsel for a hearing before an Immigration Judge.[2]  (Doc. No. 4-1 at ¶ 12.)  At this hearing, the Immigration Judge considered and denied Solis-Martinez's request for bond, finding him to be a flight risk that no amount of bond could mitigate. (*Id.*)  According to Respondents, the basis for the Immigration Judge's decision to deny bond was Solis-Martinez's failure to comply with alternate supervision in the past.  (*Id.*)  Solis-Martinez subsequently filed a motion for bond reconsideration, which was denied.[3]  (*Id.* at ¶ 13.)

Shortly thereafter, Solis-Martinez requested and was seen by medical staff at the Geauga County Jail with complaints of leg pain.  (*Id.* at ¶ 16.)  Specifically, Mr. Roberts avers as follows:

> 16. On May 13, 2020, Solis-Martinez submitted a request to be seen by medical staff at the Geauga County Jail. On May 14, 2020, his request was honored. At the appointment, Solis-Martinez complained of pain in his bones in his legs. He expressed that the cold causes pain in his body. He claimed this has been ongoing since he was a child, especially when he is cold. He reported that he was fine in detention until he started to feel cold the last couple of weeks.  The medical staff encouraged that he take Tylenol, avoid physical activity, and purchase an extra blanket from the commissary. Solis-Martinez also reported that he feels dizziness when he jumps up and has recently

---

[2] Neither party provides this Court with the docket sheet or any of the filings in Solis-Martinez's immigration proceedings. In his Declaration, Mr. Roberts avers that Solis-Martinez had several immigration court appearances after he was apprehended in December 2016, including proceedings on June 21, 2017, January 10, 2018, October 2, 2018 and August 7, 2019.  (Doc. No. 4-1 at ¶¶ 7-10.)  In addition, as noted above, Roberts avers that Solis-Martinez had a bond hearing on May 1, 2020.  As Solis-Martinez does not raise any objection, the Court relies on Mr. Roberts' Declaration when setting forth facts relating to Solis-Martinez's immigration proceedings.

[3] Respondents state that Solis-Martinez's individual merits hearing before the Immigration Judge has been continued several times, from May 27, 2020 to June 4, 2020, June 10, 2020 and June 17, 2020.  (*Id.* at ¶ 14.)  As of June 22, 2020, Solis-Martinez's case remained pending before the Immigration Court.  (*Id.*)

experienced headaches.  The medical staff also advised him to drink more water on a daily basis and to request a follow-up medical appointment if Tylenol and increasing water intake does not help him to feel better.

(*Id*.)

Meanwhile, beginning in February and March 2020, the United States began to feel the effects of the novel coronavirus or COVID-19.  As the Sixth Circuit recently explained, "[t]he COVID-19 virus is highly infectious and can be transmitted easily from person to person."  *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020).  COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. *Id*.  If contracted, COVID-19 can cause severe complications or death.  *Id*.  "Because there is no current vaccine, the Centers for Disease Control and Prevention ('CDC') recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing."  *Id*.

On May 28, 2020, Solis-Martinez filed the instant "Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief," in which he sought immediate release due to the increased risks of severe illness associated with COVID-19.  (Doc. No. 1.)  Respondents filed their Answer/Return of Writ on June 24, 2020, to which Solis-Martinez responded on July 3, 2020.  (Doc. Nos. 4, 8.)

## II.    Analysis

In his Petition, Solis-Martinez asserts that his continued detention at the Geauga County Jail violates his constitutional rights. (Doc. No. 1.) He argues he "may have a medical condition that makes him particularly vulnerable to grave illness or death if infected by COVID-19, and he faces an acute risk of contracting the virus unless he is released immediately."  (*Id*. at p.2.)  Solis-Martinez

4

maintains that conditions at the Geauga County Jail pose a heightened risk for the spread of COVID-19 because it is an "enclosed group environment where people live, sleep, and eat in close proximity." (*Id*. at p. 12.)  Specifically, Solis-Martinez asserts that (1) he and other detainees sleep in pods of up to 60 people; (2) most sleeping areas house two people and contain just enough space for two beds, one sink, one small desk, and two lockers; (3) beds are only two or three feet apart from each other; (4) detainees are "rarely, if ever, more than six feet from other people;" (5) detainees are forced to eat their meals communally, multiple times per day; (6) detainees are forced to clean without the necessary cleaning chemicals; and (7) staff does not sanitize the chairs or tables before meals.  (*Id*. at pp. 12-13.)

Given these conditions, Solis-Martinez asserts that "there are no circumstances under which Defendants can continue to detain [him] and also ensure his safety."  (*Id.* at p. 13.) In his sole ground for relief, he argues that his continued detention violates the Fifth Amendment because "the conditions of his confinement are not 'reasonably related to a legitimate governmental objective;' instead they are 'arbitrary or purposeless.'"  (*Id*. at p. 17.)  He requests that the Court issue a writ of habeas corpus and order his immediate release or, in the alternative, issue injunctive relief ordering Respondents to immediately release him, with appropriate precautionary public health measures.  (*Id.* at p. 21.)

Respondents argue that Solis-Martinez is not entitled to release because he cannot establish "that ICE has allowed dangerous conditions, nor shown that any ICE officials did so with deliberate indifference." (Doc. No. 4 at p.10.)  Specifically, Respondents assert that the Geauga County Jail "has taken extraordinary measures to prevent the spread of the virus into the facility," including (1) screening each detainee upon admission for fever and respiratory illness; (2) asking each detainee

upon admission whether he has had close contact with a person infected with COVID-19 within the past 14 days; (3) keeping all new detainees separate from the general population for 14 days; (4) increasing sanitation and stressing the importance of cleaning and handwashing; (5) providing gloves, hand sanitizer, soap and disinfectants; (6) screening all staff, contractors, volunteers and vendors for symptoms before entering the facility; and (7) restricting social visits and cancelling all programs and tours.  (*Id*. at p. 6.)  As a result of these efforts, Respondents assert that "as of 1:30 p.m. on June 23, 2020, there are zero suspected or confirmed COVID-19 cases at the Geauga County Jail."  (*Id*. at p. 7.)  Arguing that Solis-Martinez's claim should be evaluated under the Eighth Amendment deliberate indifference standard, Respondents argue that injunctive relief must be denied because he "cannot show that ICE has been deliberately indifferent to his medical needs and cannot state a constitutional claim." [4]  (*Id.* at p. 15.)

In his Reply, Solis-Martinez argues that "his detention is tantamount to a death sentence, which is inexplicable as he is not a criminal and has never been convicted of a crime."  (Doc. No. 8 at p. 3.)  He maintains that he is not a flight risk, asserting "his limited capacity hindered him in the understanding of check-in requirements and technical operation of the GPS monitor he was responsible for."  (*Id*.)  Solis-Martinez argues it is against the interests of fairness and justice to allow him to remain in detention, particularly in light of the fact that he "has no criminal record, he has

---

[4] In their Answer/Return of Writ, Respondents apply the deliberate indifference test as if this matter was before the Court upon a Motion for Preliminary Injunction; i.e., in the context of an evaluation of the "likelihood of success on the merits." Respondents then discuss and apply the other preliminary injunction factors of irreparable harm, substantial harm to others, and public interest.  Solis-Martinez does not address any of the preliminary injunction factors, either in his Petition or his Reply Brief.  For the following reasons, the Court finds that application of the preliminary injunction factors is not appropriate in the instant case.  Unlike other cases in which immigration detainees have sought release due to COVID-19, Solis-Martinez did not file either an Application for TRO or a Motion for Preliminary Injunction.  Rather, he filed a Petition and Complaint for Injunctive Relief, which does not contain a request for a preliminary injunction.  Respondents filed an Answer/Return of Writ, and Solis-Martinez then filed his Reply.  Thus, in the instant case, the Court views the Petition as being ripe for resolution and will address it as such.

pending forms of immigration relief, and [he] is expecting his first child with his wife who is due in August." (*Id.*)

Prior to reaching the merits of the parties' arguments, the Court must first determine the legal standard that governs Solis-Martinez's Fifth Amendment claim. Solis-Martinez argues that the Fifth Amendment's unconstitutional "punishment" standard applies. (Doc. No. 1 at 16-17.) Respondents, on the other hand, argue that the Eighth Amendment's more stringent deliberate indifference standard (imported into the Fifth Amendment via the Due Process Clause) applies. (Doc. No. 4 at 9.)

Under the Due Process Clause of the Fifth Amendment, the government cannot punish a detainee "prior to an adjudication of guilt." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). *See also J.H. Williamson Cty*, 951 F.3d 709, 717 (6th Cir. 2020). In *Bell*, the Supreme Court held that a pretrial detainee can demonstrate that he was subjected to unconstitutional punishment by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose.[5] *Id. See also Kingsley v. Hendrickson,* 576 U.S. 389, 398 (2015); *J.H.*, 951 F.3d at 717. The protections afforded by the Fifth Amendment apply to immigration detainees. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.") *See also Posadas-Mejia v. Adducci*, 2020 WL 3469242 at * 4 (S.D. Ohio June 25, 2020).

Several district courts within this Circuit have applied the Fifth Amendment's "unlawful punishment" standard to § 2241 petitions filed by immigration detainees seeking immediate release

---

[5] A pretrial detainee can also meet this standard by showing "an expressed intent to punish on the part of the detention facility officials." *J.H., 951 F.3d at 717.* Here, Solis-Martinez does not argue that Respondents expressed an intent to punish him and, thus, the Court does not consider this issue.

from detention due to the risks associated with COVID-19. *See, e.g, Posadas-Mejia*, 2020 WL 3469242 at * 4; *Marqus v. Adducci*, 2020 WL 2525943 at * 4 (S.D. Ohio May 18, 2020); *Prieto Refunjol v. Adducci*, ---- F.Supp.3d ----, 2020 WL 2487119 at * 15 (S.D. Ohio May 14, 2019).

Other courts in this Circuit, however, have applied the Eighth Amendment's "deliberate indifference" framework. This framework includes both an objective and a subjective prong. *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020). The objective prong requires an inmate to "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). *See also Cameron v. Bouchard*, 2020 WL 3867393 at * 4 (6th Cir. July 9, 2020). The subjective prong requires the inmate to "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The official must have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness. *Farmer*, 511 U.S. at 835, 839–40. *See also Cameron,* 2020 WL 3867393 at * 4. Several district courts within this Circuit have applied the deliberate indifference framework in this context, finding that "while the Fifth Amendment provides the basis for a civil detainee's due process claim . . . , 'claims relating to health concerns by detainees are analyzed using an Eighth-Amendment, deliberate-indifference framework.'" *See, e.g., Hango v. Adducci*, 2020 WL 3271061 at * 5 (N.D. Ohio June 17, 2020) (quoting *Toma v. Adducci*, 2020 WL 2832255 at * 4 (E.D. Mich. May 31, 2020)). *See also Malam v. Adducci*, --- F.Supp.3d ----, 2020 WL 1672662 at * 10-11 (E.D. Mich. April 6, 2020); *Albino-Martinez v. Adducci,* ---- F.Supp.3d ---, 2020 WL 1872362 at * 2-3 (E.D. Mich. April 14, 2020).

A recent Sixth Circuit decision sheds some light on this issue.  On July 9, 2020 (after the parties had submitted their briefing in the instant case), the Sixth Circuit evaluated the claims of pretrial detainees seeking release from detention due to COVID-19 under the Eighth Amendment's deliberate indifference framework.  In *Cameron v. Bouchard*, 2020 WL 3867393 (6th Cir. July 9, 2020), a group of five pretrial detainees and convicted prisoners housed in the Oakland County, Michigan jail filed a complaint under 42 U.S.C. § 1983 as well as a § 2241 Petition, on behalf of themselves and others housed there.  *Id*. at *1.  They claimed, among other things, that defendants' deliberate indifference to the substantial risk of harm posed by COVID-19 at the Jail violated their rights under the Eighth and Fourteenth[6] Amendments.  *Id.*  The district court granted a preliminary injunction, which the Sixth Circuit stayed.  *Id.* at *1, 3.

On appeal, the Sixth Circuit vacated the district court's decision granting a preliminary injunction.  The court first considered the analytical framework for plaintiffs' claims:

> The Supreme Court has long recognized that the government has a constitutional obligation to "provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted).  As part of this duty, officials must "take reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).  For prisoners incarcerated following a conviction, the government's obligation arises out of the Eighth Amendment's prohibition on cruel and unusual punishment. *See Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).  For pretrial detainees, the obligation arises out of the Due Process Clause of the Fifth or Fourteenth Amendment. *See id*.

---

[6] The Due Process Clauses of the Fifth and Fourteenth Amendments prevent the federal and state governments from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  The Fifth Amendment due process guarantee applies to the federal government, while the Fourteenth Amendment applies to state governments. *See Palmer v. Schuette*, 768 Fed. Appx 422, 426–27 (6th Cir. 2019) (citing *Scott v. Clay Cty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000)) ("While the Fifth Amendment undeniably contains a due process guarantee, it applies to federal, not state, officials and thus the district court limited its analysis to plaintiff's claim to the due process protections of the Fourteenth Amendment.").

*Id*. at \*4.  The court then explained that "[c]onditions-of-confinement claims are assessed under the 'deliberate indifference' framework," and proceeded to evaluate all of the plaintiffs' (including the pretrial detainees') claims under that framework.  *Id*. at \*4-5.  Thus, the Sixth Circuit's decision suggests that the proper analytical approach for Solis-Martinez's conditions of confinement claims under § 2241 is the Eighth Amendment deliberate indifference framework, as incorporated by the Due Process Clause of the Fifth Amendment.

The Court notes that, in *Cameron*, the plaintiffs argued that the Sixth Circuit should adopt a "new standard" for pretrial detainees in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).  In *Kingsley*, the Supreme Court held that it is inappropriate to apply a subjective analysis when evaluating excessive force claims of pretrial detainees.  *Id*. at 396-397.  Instead, the Court held that an officer's state of mind in an excessive force claim brought under the Fourteenth Amendment must be assessed using solely an *objective* standard.  As the Sixth Circuit explained, "[t]he touchstone of the *Kingsley* test is whether the official's actions were 'objectively unreasonable.'" *Cameron*, 2020 WL 3867393 at \* 4.[7]  The Sixth Circuit found it need not decide whether to adopt the *Kingsley* standard, however, explaining as follows:

> We need not resolve the issue today, because no matter the approach we adopt, the outcome is the same.  Even if the pretrial detainees do not need to introduce evidence of subjective recklessness in light of *Kingsley*, they acknowledge that **they still must**

---

[7] Since *Kingsley,* the circuits have split on whether deliberate indifference claims arising under the Due Process Clause of the Fifth and/or Fourteenth Amendments are still governed by *Farmer* (requiring a subjective inquiry for an officer's state of mind), or instead are governed by *Kingsley* (requiring an objective inquiry for an officer's state of mind). *Compare Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (adopting a new objective standard for deliberate indifference claims brought by pretrial detainees); *Darnell v. Pineiro,* 849 F.3d 17, 35 (2d Cir. 2017) (same); *Miranda v. Cty. of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) (same) with *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 n. 4 (5th Cir. 2017) (declining to reconsider its earlier precedent treating Eighth and Fourteenth Amendment claims alike); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (same); *Nam Dang by and through Vina Dang v. Sheriff, Seminole Cty. Florida*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same).  The Sixth Circuit has not ruled on the issue.  *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018) (declining to address the issue because it was not raised by either party).

10

**prove something more than that the Defendants acted unreasonably.  A "claim for a violation of due process requires proof of a mens rea greater than mere negligence.**" *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (citing *Kingsley*, 135 S. Ct. at 2472). The test they propose would still require either "something akin to reckless disregard," *see Castro*, 833 F.3d at 1071, or that they "knew or should have known" of the risk and nonetheless "recklessly failed to act", *see Darnell*, 849 F.3d at 35. *See also Miranda*, 900 F.3d at 353 (requiring proof that officials acted "purposefully, knowingly, or perhaps even recklessly"). **The evidence Plaintiffs presented is insufficient to demonstrate that the jail officials acted with reckless disregard to the serious risk COVID-19 poses. Indeed, the steps that jail officials took to prevent the spread of COVID-19 were reasonable**. Such steps include: distributing a memo to the Jail staff about proper cleaning procedures intended to limit the spread within the Jail; stopping all visitation; initiating new arrest screenings for COVID-19; initiating a prison release program, in which 110 inmates were released by Michigan state courts; quarantining new arrestees for 14 days; quarantining any inmate experiencing symptoms of COVID-19 and any inmate who had contact with a symptomatic inmate; checking inmates who were in symptomatic quarantine three times a day with a full set of vitals including a temperature check; placing inmates that tested positive in the positive COVID-19 cells; offering level-one masks and medical treatment to all inmates; cancelling group activities; using prepackaged meals for food service; using a UVI disinfecting machine and sanitizing cells more frequently; giving all inmates access to a disinfectant called DMQ, which is effective against COVID-19; promoting social distancing by reducing cell numbers depending upon inmate classification; and providing access to COVID-19 testing to the entire inmate population.

*Id*. at * 5 (emphasis added).  The court noted that the above steps were "very similar" to the measures taken by prison officials in *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), a recent case in which the Sixth Circuit vacated a preliminary injunction requiring the Federal Bureau of Prisons ("BOP") to identify medically vulnerable inmates and evaluate their eligibility for transfer out of confinement at FCI Elkton.  In *Wilson*, the Sixth Circuit found that the plaintiffs had not demonstrated a likelihood of success on the merits because the BOP had "responded reasonably" to the risks presented by

COVID-19 by taking a number of similar measures[8] to control the virus.  *Wilson,* 961 F.3d at 839-840.

The *Cameron* court concluded that "given the similarity of the BOP's response in *Wilson* and Defendants' response here, *Wilson* controls the outcome of this case, even if *Farmer*'s subjective component does not apply to Plaintiffs' Fourteenth Amendment claims."  *Cameron,* 2020 WL 3867393 at * 6.   The court went onto find that the plaintiffs were unlikely to succeed on their claims because "while the harm imposed by COVID-19 on inmates at [the Jail] 'ultimately [may] not [be] averted,' [Defendants have] 'responded reasonably to the risk' and therefore ha[ve] [likely] not been deliberately indifferent to the inmates' Eighth Amendment rights." *Id*. at * 8 (quoting *Wilson*, 961 F.3d at 841).

The Sixth Circuit's decisions in *Cameron* and *Wilson* control the outcome of the instant case. As in *Cameron,* under either the *Farmer* or *Kingsley* standards,[9] Solis-Martinez has not demonstrated deliberate indifference because he has failed to show that, under the particular circumstances presented, ICE responded unreasonably to the risks posed by COVID-19.

Respondents have come forward with evidence of numerous measures taken by Respondents and jail officials to control the spread of the virus in the Geauga County Jail.   In particular,

---

[8]  The measures taken by the BOP in *Wilson* included the following: "implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff." *Wilson*, 961 F.3d at 840-841.

[9] Here, the parties have not raised the issue of whether the deliberate indifference standard announced in *Kingsley* should apply to Solis-Martinez's claims and, thus, the Court does not consider that issue.

12

Respondents submitted the Declaration of Ryan M. Overton, Assistant Field Officer with the Detroit Field Office of Enforcement and Removal Operations ("ERO"), U.S. Department of Homeland Security ("DHS") in Brooklyn Heights, Ohio.  (Doc. No. 4-2.)  Mr. Overton avers that his duties include oversight of ICE detention facility matters within Northern Ohio.  (*Id.* at ¶ 1.)  He states that, since the onset of reports of COVID-19, ICE epidemiologists "have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees."[10]  (*Id.* at ¶ 8.)  With regard to specific steps taken (by ICE generally and the Geauga County Jail[11] in particular) to address the risks posed by COVID-19, Mr. Overton states as follows:

> 11. At the Geauga County Jail, each detainee is screened for disabilities upon admission. Health trained officers conduct the initial medical screening. A Registered Nurse then reviews and evaluates in sick call. Identified disabilities are further evaluated and reasonable accommodations are provided as medically appropriate.
>
> 12. At the Geauga County Jail, during intake medical screenings, detainees are assessed for fever and respiratory illness and are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days. Screening is not limited to COVID-19, but includes medical history, mental health history, current problems, medications, etc.
>
> 13. The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee. All new arriving detainees are kept separate to be screened for potential symptoms. New arriving detainees are kept separate for 14 days prior to going to general population. Those detainees who present symptoms compatible with COVID-19 will be placed in isolation. Detainees with two elevated

---

[10] In particular, Mr. Overton states that, "[o]n April 10, 2020, ICE ERO released its ERO COVID-19 Pandemic Response Requirements (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this pandemic. An updated version of the PRR was released on June 22, 2020."  (*Id.* at ¶ 10.)

[11] Mr. Overton avers that "[t]he Geauga County Jail is a state and local law enforcement partner that successfully manages its own populations under federal, state, and local regulations, and assists ICE with housing immigration detainees to enforce immigration laws and improve national safety and security. Conditions of ICE detention at the Geauga County Jail are governed by ICE's 2000 National Detention Standards."  (*Id.* at ¶ 4.)

temperatures will have swabs taken in the facility and sent to an outside lab for testing. If testing is positive, they will remain isolated and treated. In case of any clinical deterioration, they will be referred to a local hospital.

14. In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill person) and are monitored daily for fever and symptoms of respiratory illness. Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. This practice lasts for the duration of the incubation period of 14 days, because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases ... In the Geauga County Jail, cohorting is achieved in the following manners:

o Inmates/detainees who have had possible exposure to positive or suspected cases of COVID-19 can be housed in single cells.

o Any new intakes who are symptomatic or answer affirmatively in response to the COVID-19 questionnaire are housed in single cells for quarantine or medical observation in PODs dedicated for such purpose.

o Any new intakes who are asymptomatic or respond no in response to the COVID-19 questions are housed one to a cell (or two if they arrived together) for 14 days after intake before being released into the general population.

o Inmates/detainees who become symptomatic are transferred to PODs specifically dedicated for quarantine and medical observation. The cellmates of inmates/detainees described in this situation are also transferred to the PODs dedicated for quarantine and medical observation and cohorted.

***

18. The Geauga County Jail has increased sanitation and stressed the importance of cleaning and hand washing with the inmates and staff. The medical office itself is wiped down at least daily, including the medical cart that goes around to the pods. Supplies, such as gloves, hand sanitizer, soap, disinfectants are provided for sanitation. Soap is available to detainees at no charge upon order through the commissary. Two towels are provided to each detainee for personal use, to include drying of hands, showers, and cleaning. Towels are changed out twice a week. Detainees are given two rolls of toilet paper per week.

14

19. The Geauga County Jail restricted social visits from March 13, 2020 through June 19, 2020. Non-contact social visitation resumed on Saturday, June 20, 2020 via the onsite video system. Cleaning supplies have been placed in all visitation areas in order for visitors and inmates alike to wipe down phones and booth areas. All programs and tours have been cancelled. Only essential jail staff is permitted into the jail. Legal visits are restricted to public defenders, as needed and authorized. Detainees continue to have telephone access to speak with attorneys.

20. The Geauga County Jail is screening all staff, contractors, volunteers, and vendors when they enter the facility including body temperatures.

21. The Geauga County Jail provides education on COVID-19 to staff and detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. In addition to verbal information, each pod has information from the CDC posted in both English and Spanish. All staff is updated frequently with new information and reminders about prevention.

\*\*\*

23. ICE reviews its detained population of people who are "at higher risk for severe illness," as identified by the CDC, to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety and well-being of its detainees.

(*Id*. at ¶¶ 11-14, 18-21, 23.)  Mr. Overton notes that "as of 1:30 p.m. on June 23, 2020, I have been informed that there are zero suspected or confirmed cases of COVID-19 at the Geauga County Jail."[12]

(*Id*. at ¶ 16.)

Based on the above, it is evident that Respondents and Geauga County Jail officials are aware of and understand the potential risk of serious harm to detainees through exposure to the COVID-19 virus.  It is also evident that Respondents have taken numerous precautions to address the particular

---

[12] In his Petition, Solis-Martinez states that "Geauga Jail confirmed the first case of COVID-19 on March 16, 2020 and the disease has begun to spread."  (Doc. No. 1 at p. 13.)  Respondents insist that no cases of COVID-19 have been confirmed at the Geauga County Jail.  (Doc. No. 4 at p. 7.)  In his Reply, Solis-Martinez acknowledges that there are currently no confirmed cases of COVID-19 at the Jail, arguing instead that "the County of Geauga which is rather small and is where Mr. Solis-Martinez is being detained, has 390 confirmed cases of coronavirus."  (Doc. No. 8 at p. 3.)

15

risks faced by individuals detained in the Geauga County Jail.  The measures outlined in Mr. Overton's Declaration (including screening and isolating new detainees for 14 days, increasing sanitation measures, restricting visitors, screening staff and contractors, providing education regarding COVID-19, and reviewing the detained population for those at higher risk) are substantially similar to the screening and prevention steps taken by the respondents in both *Cameron* and *Wilson*. As discussed above, in both of those cases, the Sixth Circuit found that respondents had responded reasonably to address the risks posed by COVID-19 and petitioners had, therefore, failed to demonstrate likelihood of success on the merits of their claims that respondents had been deliberately indifferent to their health concerns.  *See Cameron*, 2020 WL 3867393 at * 5-8; *Wilson,* 961 F.3d at 841.   District courts within this Circuit have reached the same conclusion under similar circumstances.  *See, e.g., Hango*, 2020 WL 3271061 at * 7 (finding petitioner failed to demonstrate likelihood of success on the merits where respondents' response to the dangers posed by COVID-19 was "swift, thorough, and thoughtful").  *See also Toma*, 2020 WL 2832255 at * 6; *Albino-Martinez*, 2020 WL 1872362 at * 4.

Solis-Martinez argues that the measures undertaken by the Geauga County Jail are insufficient because detainees sleep in pods of up to 60 people, where there is insufficient ventilation and beds are only two to three feet apart.  (Doc. No. 1 at p. 12-13.)  He also complains that detainees continue to eat their meals communally and argues that "staff does not sanitize the chairs or tables before meals."  (*Id*.)  In addition, and contrary to Mr. Overton's Declaration, Solis-Martinez asserts that "there have been no changes to cleaning or sanitation procedures since the COVID-1 pandemic began" and "detainees are forced to clean without the necessary cleaning chemicals."  (*Id*.)  He also

16

maintains that "only some of the officers wear masks and gloves."[13] (Doc. No. 1-1 at ¶ 8.)  Finally, Solis-Martinez argues generally that, given these conditions, it is impossible to maintain social distancing at the Geauga County Jail, thus increasing the potential risk to all detainees.[14]  (*Id.*)

The Court finds Solis-Martinez's arguments unavailing.  With regard to Solis-Martinez's complaints regarding the Geauga County Jail's dormitory-style housing, Mr. Roberts avers that Solis-Martinez is housed in the J Dorm, which has a capacity of 60 persons.  (Doc. No. 4-1 at ¶ 17.)  Mr. Roberts states that, due to the coronavirus pandemic, capacity at the J Dorm has been limited to 30 persons and detainees reside at least one bunk away from one another.  (*Id.*)  In addition, Mr. Overton states that, as of June 23, 2020, there are a total of 23 individuals housed in the J Dorm (i.e., 14 ICE detainees and 8 inmates).  (Doc. No. 4-2 at ¶ 17b.)  Solis-Martinez does not challenge these assertions in his Reply Brief.  (Doc. No. 8.)  To the contrary, in his Declaration, Solis-Martinez states that there are 20 detainees in his dormitory, which is roughly consistent with Mr. Overton's Declaration.  (Doc. No. 1-1 at ¶ 7.)

The Court finds that the measures taken by Respondents and Geauga County Jail officials represent a reasonable response to the serious risks posed by COVID-19.  As noted above, Respondents have recognized the risks associated with dormitory-style housing and made reasonable

---

[13] Solis-Martinez's Declaration is internally inconsistent regarding the use of masks by inmates.  In paragraph 7 of his Declaration, Solis-Martinez states that "[t]here are no inmates who wear protective gloves or masks."  (Doc. No. 1-1.)  However, in the next paragraph, he indicates that at least some inmates do wear masks when he states that "there are several inmates who have symptoms of COVID-19, and many of those are not wearing masks."  (*Id.* at ¶ 8.)

[14] In support of this argument, Solis-Martinez submits the Declaration of Boris Vinogradsky, M.D., FACS, who specializes in General Surgery and is a physician "working with COVID-19 patients."  (Doc. No. 1-2.)  Dr. Vinogradsky avers that the conditions at the Geauga County Jail "violate the most critical and fundamental guidance issued by the" CDC regarding social distancing and the avoidance of congregative environments.  (*Id.* at ¶ 2.)  He asserts that the conditions at the Geauga County Jail prevent Solis-Martinez from maintaining social distancing due to the fact that he is forced to live in dormitory-style housing.  (*Id.* at ¶ 8.)

efforts to ameliorate that risk by screening detainees upon arrival for symptoms, isolating all new detainees from the general population for 14 days, placing all new detainees with COVID-19 symptoms in isolation, significantly limiting capacity in the J Dorm, and requiring that detainees sleep at least one bunk apart. While these measures may be imperfect in some respects, Solis-Martinez has not shown that they are unreasonable. Nor has Solis-Martinez sufficiently shown that Respondents have disregarded a known risk or failed to take any steps to address the risk. *See Wilson*, 961 F.3d at 843 ("Here, even if the BOP's response has been inadequate, it has not disregarded a known risk or failed to take any steps to address the risk, . . . , such that its response falls below the constitutional minimum set by the Eighth Amendment."); *Cameron*, 2020 WL 3867393 at * 6 ("[P]laintiff's argument at most shows that defendant's response was imperfect. That is not enough to establish deliberate indifference.")

Likewise, the Court rejects Solis-Martinez's argument that he is entitled to immediate release because detainees eat communal meals and jail staff allegedly fail to wear masks or properly sanitize the facility. Although conditions in the jail may not be ideal, the measures taken at the Geauga County Jail are reasonable and substantially similar to the measures taken by prison officials in both *Wilson* and *Cameron*, which the Sixth Circuit found sufficient to pass constitutional muster. Moreover, the Court notes that the measures taken at the Geauga County Jail to prevent the spread of the virus have thus far been entirely effective in blocking the spread of the virus to the facility. Several district courts have denied relief under similar circumstances. *See, e.g, Hango*, 2020 WL 3271061 at * 7 ("The measures respondent, ICE, and officials at the jail have taken—which have been entirely effective in blocking the spread of the virus to the facility—represent a reasonable response to the serious risk Hango faces with respect to COVID-19 and render it highly unlikely that Hango could

18

ever satisfy the subjective prong of the deliberate indifference standard."); *Toma*, 2020 WL 2832255 at * 6; *Marqus*, 2020 WL 2525943 at * 5.

Moreover, the Court is not persuaded by Solis-Martinez's argument that he is particularly susceptible to the risk of serious illness or death from COVID-19 due to his underlying health conditions.  It is by now well-established that certain individuals are at a higher risk for complications from the coronavirus.  Specifically, the Centers for Disease Control and Prevention ("CDC") have advised that people aged 65 years and older may be at higher risk for severe illness from COVID-19. *See People Who Are At Higher Risk*, Centers for Disease Control and Prevention (July 16, 2020), https://www.cdc.gov/coronovirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.   In addition, the CDC has noted that people of any age with the following conditions are at increased risk of severe illness from COVID-19: (1) chronic kidney disease, (2) COPD (chronic obstructive pulmonary disease), (3) immunocompromised state from solid organ transplant, (4) obesity, (5) serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, (6) sickle cell disease, and (7) type 2 diabetes mellitus.  *Id*.  The CDC has also determined that certain conditions might pose an increased risk for severe illness from COVID-19, including asthma, cerebrovascular disease, cystic fibrosis, high blood pressure, immune deficiencies, HIV, use of corticosteroids or use of other immune weakening medicines, neurologic conditions such as dementia, liver disease, pulmonary fibrosis, smoking, thalassemia (a type of blood disorder), and type 1 diabetes mellitus.  *Id.*

Here, Solis-Martinez is 21 years old and, thus, not in an at-risk age category.  Nonetheless, he contends that he "may have a medical condition that makes him particularly vulnerable to grave illness or death if infected by COVID-19."  (Doc. No. 1 at p. 2.)  Specifically, he argues that he suffers from "chronic headaches, leg pain, and neck pain for which he took medication pre-detention."  (*Id.*

at p. 5.)  Solis-Martinez also avers that he has had "health issues in the past," including chronic leg pain, headaches, dizziness, anxiety and depression.[15] (Doc. No. 1-1 at ¶ 6.)

The Court finds Solis-Martinez has not demonstrated that he is particularly vulnerable to serious illness or death as a result of COVID-19.  None of the health conditions he identifies are among those identified by the CDC as creating an increased risk for serious illness or death. Moreover, although he could have done so, Solis-Martinez has not provided the Court with any medical records or other documentation regarding the precise nature and/or extent of any of his health conditions.[16]  This is particularly problematic given evidence submitted by Respondents that, when he was taken into ICE custody in February 2020, Solis-Martinez advised medical staff that he does not take any medications nor does he have any heart or respiratory-related problems.  (Doc. No. 4-1 at ¶ 15.)  Moreover, while Solis-Martinez did apparently complain of "pain in his bones," dizziness, and headaches on May 14, 2020, he has not sufficiently demonstrated that these conditions render him vulnerable to COVID-19.  Nor has he alleged that these particular conditions have worsened, or

---

[15] In the Petition, Solis-Martinez states that "he avers" that he "has had a persistent cough for which he has been unable to obtain treatment."  (Doc. No. 1 at p. 16.)  He also states that he has "been unable to take medication for [his] ailments while in detention." (*Id*.)  However, in his Declaration, Solis-Martinez does not, in fact, aver that he has had a persistent cough, nor does he aver that he has been denied medication or other medical treatment.  (Doc. No. 1-1.)  Moreover, in his Reply Brief, Solis-Martinez does not contest Mr. Robert's averments that Solis-Martinez "advised medical staff on admission that he did not take any medications, nor does he have any heart or respiratory related problems."  (Doc. No. 4-1 at ¶ 15.)  Solis-Martinez also does not challenge Mr. Robert's statement that Solis-Martinez was seen by medical staff on May 14, 2020 for complaints of "pain in his bones," dizziness, and headaches.  (*Id*. at ¶ 16.)  According to Mr. Roberts, Solis-Martinez did not complain at that time of a persistent cough.  (*Id*.)

[16] The Court notes that, in his Declaration, Dr. Vinogradsky avers that "it is my firm professional judgment that Petitioner is significantly safer in his residence, where he would be able to practice critical social distancing and take other preventative measures than he is in detention at Geauga County Jail."  (*Id*. at ¶ 14.)  He further states that "the conditions at the Geauga County Jail place the Petitioner at a significantly heightened and medically unacceptable risk of not only contracting COVID-19, but also of suffering severe complications and serious outcomes if he does become infected." (*Id*.)  The Court does not find Dr. Vinogradsky's Declaration to be persuasive.  Dr. Vinogradsky does not aver that he has examined Solis-Martinez or reviewed his medical records.  Indeed, Dr. Vinogradsky does not offer any diagnoses or state that Solis-Martinez suffers from any particular medical conditions.  Nor does he otherwise provide any basis for his opinion that Solis-Martinez will suffer "severe complications and serious outcomes if he does become infected." Accordingly, the Court does not accord any weight to Dr. Vinogradsky's opinion in this regard.

that he has sought medical assistance for any other conditions or issues while at the Geauga County Jail.

In sum, the Court finds that Solis-Martinez has failed to demonstrate that Respondents have been deliberately indifferent to his present or future health concerns.  As discussed at length above, by implementing the many measures discussed above, Respondents have recognized and responded reasonably to the risks associated with COVID-19.  Moreover, even applying only the objective reasonableness deliberate indifference standard set forth in *Kingsley* and discussed in *Cameron*, Solis-Martinez's claim fails because he has not shown that Respondents and Geauga County jail officials acted with reckless disregard to the serious risk COVID-19 poses.[17]  *Cameron,* 2020 WL 3867393 at * 5.  The fact that Solis-Martinez has not come forward with sufficient evidence demonstrating that he is particularly vulnerable to serious illness or death from COVID-19-related complications further supports the Court's finding herein.

Finally, even if the Court were to consider Solis-Martinez's claim under the Fifth Amendment "unlawful punishment" standard, the outcome would be the same.  As noted above, a pretrial detainee can demonstrate that he was subjected to unconstitutional punishment by showing that a restriction or condition is not rationally related to a legitimate government objective or is excessive in relation to that purpose.  *See Bell*, 441 U.S. at 535 (1979); *J.H.*, 951 F.3d at 717.  Here, the Court finds that Respondents are detaining Solis-Martinez pursuant to a legitimate government objective.  The government undoubtedly has a legitimate interest in detaining certain individuals prior to a formal

---

[17] If the Court were to apply the subjective prong of the deliberate indifference test, Solis-Martinez's claim would also fail.  As noted *supra*, the subjective prong requires the inmate to "show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and then disregarded the risk."  *Farmer*, 511 U.S. at 837.  Solis-Martinez has not directed this Court's attention to any evidence that would satisfy this standard.

adjudication of their case, where a court has found the detention necessary to ensure the appearance of the individual for court proceedings. *See Bell*, 441 at 534 ("confinement of [certain pretrial detainees] pending trial is a legitimate means of furthering a [substantial government] interest"); *Prieto*, 2020 WL 2487119 at * 20; *Posadas-Maija*, 2020 WL 3469242 at * 4.  While Solis-Martinez argues that detention is not necessary because he is not a flight risk, the Immigration Judge conducted a bond hearing on this very issue on May 1, 2020 and found him to be a flight risk that no amount of bond could mitigate given his repeated failure to comply with electronic monitoring requirements. (Doc. No. 4-1 at ¶ 12.)  Solis-Martinez argues that his failure to comply with these requirements was not intentional but, rather, due to his significant cognitive deficits.  He does not, however, offer any assurance that, if released, he would be able to comply with any future reporting or monitoring requirements pending his immigration hearing. The Court finds that evidence of Solis-Martinez's alleged cognitive deficits is not sufficient to show that the government does not have a legitimate interest in detaining him.

The key question, then, is whether Solis-Martinez's continued detention poses a risk to his safety that outweighs (i.e., "is excessive in relation to") Respondents' interest in detaining him.  *See Prieto*, 2020 WL 2487119 at * 21; *Posadas-Mejia*, 2020 WL 3469242 at * 4.  The Court finds that it does not, for all the reasons discussed above.  Specifically, as explained at length, Respondents and Geauga County Jail officials have implemented numerous measures to protect detainees from the spread of the virus.  These measures appear to have been effective given that, as of the date of this Opinion, there have been no reported cases of COVID-19 at the Geauga County Jail.  Moreover, Solis-Martinez has not sufficiently demonstrated that he is at high risk for severe illness or death due

to COVID-19-related complications. Accordingly, even if the Court were to apply the "unlawful punishment" standard advocated by Solis-Martinez, his claim fails.

## III. Request for Hearing

In his Reply Brief, Solis-Martinez asserts, summarily, that he is entitled to a hearing on the merits of his case. (Doc. No. 8 at p. 3.) Although represented by counsel, he does not cite any legal authority in support of this request. Nor does he identify the evidence that he would seek to introduce at a hearing or explain how such evidence is necessary for resolution of the instant Petition.

The Court recognizes that there are some factual discrepancies between the parties' descriptions of the measures taken at the Geauga County Jail to control the virus. While Respondents have introduced evidence that jail staff has increased sanitation and provided soap and appropriate cleaning materials to detainees, Solis-Martinez avers that "they force us to clean without the necessary chemical cleaning products." (Doc. No. 1-1 at ¶ 7.) Moreover, in his Petition (but not his Declaration), Solis-Martinez argues that "there have been no changes to cleaning or sanitation procedures since the COVID-19 pandemic began;" "staff does not sanitize the chairs or tables before meals," and "detainees do not have free access to soap."[18] (Doc. No. 1 at p. 13.) Respondents, on the other hand, have introduced evidence that (1) "the Geauga County Jail increased sanitation and stressed the importance of cleaning and hand washing with the inmates and staff; (2) "[s]upplies such as gloves, hand sanitizer, soap [and] disinfectants are provided for sanitation;" and (3) "soap is available to detainees at no charge upon order through the commissary." (Doc. No. 4-2 at ¶ 18.)

---

[18] Notably, these particular allegations do not appear in Solis-Martinez's Declaration. *See* Doc. No. 1-1. Thus, Solis-Martinez has not offered any evidentiary support for these allegations. By contrast, Respondents' allegations to the contrary are supported by the sworn statement of Mr. Overton. (Doc. No. 4-2 at ¶ 18.)

23

Under the circumstances presented, the Court finds that a hearing is not warranted in the instant case.  Even if the Court were to conduct a hearing and find Solis-Martinez's testimony regarding these factual discrepancies to be credible, the Court would nonetheless conclude that the measures taken by Respondents to control the virus at the Geauga County Jail represent a reasonable response to the risks posed by COVID-19.  Solis-Martinez does not contest that new detainees are screened for COVID-19 symptoms and exposure upon arrival, and isolated from the general population for 14 days.  Nor does he contest Respondents' evidence regarding cohorting, restriction of social visits, and screening of all staff, contractors, volunteers, and vendors when they enter the facility.  Likewise, Solis-Martinez does not contest that Respondents have significantly limited the capacity at the J Dorm from 60 to 30 detainees and that, currently, that are less than 30 detainees/inmates housed in that Dorm.  *See* Solis-Martinez Decl. (Doc. No. 1-1) at ¶ 7 (stating that there are currently 20 detainees in his dormitory cell).  Finally, Solis-Martinez has not presented any evidence that there are currently any known cases of COVID-19 at the Geauga County Jail.

In light of the above, the Court declines to hold a hearing.  Even construing the factual discrepancies discussed above in Solis-Martinez's favor, the Court would nevertheless find that Solis-Martinez had failed to demonstrate that his continued detention violates his constitutional rights, under either the Fifth Amendment "unlawful punishment" or Eighth Amendment "deliberate indifference" standards.

## IV.     Conclusion

Accordingly, and for all the reasons set forth above, Solis-Martinez's Petition (Doc. No. 1) is

DISMISSED and his request for injunctive relief is DENIED.

**IT IS SO ORDERED.**


        _s/Pamela A. Barker_
        PAMELA A. BARKER
Date:  July 20, 2020        U. S. DISTRICT JUDGE